See also, D.C., 125 F.R.D. 646.

**Jane DOE (Identity Furnished Upon Request), Plaintiff,**

**v.**

**AMERICAN RED CROSS BLOOD SERVICES, S.C. REGION, Defendant.**

**John DOE (Identity Furnished Upon Request), Plaintiff,**

**v.**

**AMERICAN RED CROSS BLOOD SERVICES, S.C. REGION, Defendant.**

**Civ. A. Nos. 3:87–59–15, 3:87–60–15.**

United States District Court,
D. South Carolina,
Columbia Division.

May 5, 1989.

Benjamin M. Mabry, Cromer & Mabry, Charles L. Henshaw, Jr., Law Offices of O. Fayrell Furr, Columbia, S.C., for plaintiff.

Stephen G. Morrison, David E. Dukes, Nelson, Mullins, Riley & Scarborough, Columbia, S.C., Bruce M. Chadwick, Arnold & Porter, Washington, D.C., for American Red Cross.

---

## ORDER

HAMILTON, District Judge.

In this negligence action, the plaintiff, Jane Doe, contends that she contracted the human immunodeficiency virus ("HIV"), which causes the deadly acquired immune deficiency syndrome ("AIDS"), from a unit of blood collected and processed by the defendant, American Red Cross Blood Services, S.C. Region ("Red Cross"). The matter is presently before the court on Red Cross' motion for summary judgment. Rule 56, Fed.R.Civ.Proc.

### Factual Background

In early January of 1985, Jane Doe entered the Lexington County Hospital in Lexington, South Carolina for spleen and gall bladder surgery. During her operation on January 9, 1985, she received a blood transfusion contaminated with the virus known to cause AIDS. Red Cross had collected the contaminated unit of blood from a volunteer donor in Columbia, South Carolina on January 4, 1985. Although Jane Doe has not yet developed AIDS, she has contracted HIV, she currently suffers from AIDS-related complex (or pre-AIDS), and, according to her treating physicians and other experts, she will most probably develop AIDS, which will cause her early death.

On December 8, 1986, Jane Doe instituted this negligence action against Lexington County Hospital and Red Cross in the Court of Common Pleas for Richland County, South Carolina. On the same day, her husband, John Doe, instituted a suit for loss of consortium, and the two suits were consolidated. Defendants subsequently removed the cases by petition filed January 9, 1987. Plaintiffs have since dismissed the Lexington County Hospital and now only seek redress from Red Cross.

Plaintiffs do not dispute that a direct test for AIDS was not available until May of 1985, four months after Jane Doe received the transfusion in question. Plaintiffs contend, however, that Red Cross was negligent in failing to employ, before January of 1985, a surrogate test[1] to identify for exclusion blood donors who were at high risk for transmitting AIDS.[2] Plaintiffs focus in particular upon the test for hepatitis B core antibody ("anti-HBc").

Plaintiffs concede that the generally recognized and accepted practice among blood banks nationwide in January of 1985 was not to use surrogate tests to screen out donors at high risk for spreading AIDS. They argue, however, that: (1) the donor whose blood contaminated Jane Doe most probably would have been screened out by anti-HBc testing; (2) anti-HBc screening was recognized as available, feasible, and effective when Red Cross, and other volunteer blood collection centers in San Francisco, California, implemented anti-HBc screening as a surrogate test for AIDS in the summer of 1984; and (3) anti-HBc screening was commensurate with the nationwide risk of transfusion-associated AIDS caused by the nationwide movement of blood and the nationwide incidence of AIDS.

On January 29, 1988, Red Cross moved for summary judgment. Rule 56, Fed.R.Civ.Proc. Red Cross contends that, under South Carolina law, professionals cannot be negligent when their acts or omissions are consistent with generally recognized and accepted professional practices. In other words, in professional malpractice cases, generally recognized and accepted practices are not merely evidence of the standard of care, but, instead, actually constitute the standard of care owed by the professional. Red Cross further contends that blood

---

1. As the name implies, a surrogate test is not a direct test for a condition, but rather a substitute for the real thing. It is based upon a correlation between the target condition, which cannot be identified directly, and another condition, which often occurs when the target is present and rarely occurs when it is not. The utility of such a test depends on the closeness of these correlations.

2. Plaintiffs also contend that Red Cross was negligent in not permanently disqualifying the donor in question based upon the health history he gave while donating blood on July 25, 1984. The question of whether Red Cross is entitled to summary judgment on the "donor disqualification issue" is still under advisement and will not be addressed in this Order.

banking, which involves professional expertise, is subject to the standard of care applicable to professionals. Since its failure to employ anti-HBc testing nationwide by January of 1985 was fully consistent with the generally recognized and accepted practices of the blood banking industry, Red Cross contends that it is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.Proc.

Plaintiffs, on the other hand, contend that South Carolina law does not absolve professionals from negligence liability simply because their acts or omissions are consistent with generally recognized and accepted practices within their profession. According to plaintiffs, professionals are subject to ordinary negligence principles, under which compliance with generally recognized and accepted practices is merely evidence that a defendant acted with due care and is rarely, if ever, conclusive. *See The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir. 1932); *W. Prosser*, Law of Torts § 33 (5th ed. 1984). Plaintiffs argue, in the alternative, that even if South Carolina recognizes a "professional negligence standard," such a standard would not apply in a suit against a blood bank such as Red Cross. Plaintiffs concede, however, that Red Cross is entitled to summary judgment on the "negligent testing issue" if: (1) South Carolina does recognize the "professional negligence standard"; and (2) South Carolina would apply this "professional negligence standard" to blood banks.

 After considering the arguments and authorities presented by counsel, after engaging in a great deal of independent research, and after holding a hearing on the matter, this court tentatively concluded that South Carolina recognizes the "professional negligence standard" and would apply it in a professional negligence suit against a blood bank such as Red Cross. *See Doe v. American Red Cross Blood Services*, Civil Action Nos.: 3:87–59–15 and 3:87–60–15, slip op. at 11–12 (D.S.C. June 14, 1988) (copy attached as Appendix A). But because these were important issues of

state law, on which the South Carolina Supreme Court had not spoken clearly, this court decided to certify the following questions under Supreme Court Rule 46:[3]

### Question I:

Does South Carolina recognize a separate standard of care for professionals under which generally recognized and accepted practices in the profession constitute the standard of care owed by a member of that profession?

### Question II:

If South Carolina recognizes a "professional negligence standard," would it apply to a blood bank such as Red Cross?

*Id.* at 7–11. The South Carolina Supreme Court answered both of these questions in the affirmative. *See Doe v. American Red Cross Blood Services*, 297 S.C. 430, 377 S.E.2d 323 (1989).

In its opinion, the South Carolina Supreme Court explicitly announced a rule setting forth a separate standard of care for professionals:

We now hold that in a professional negligence cause of action, the standard of care that the plaintiff must prove is that the professional failed to conform to the generally recognized and accepted practices in his profession. If the plaintiff is unable to demonstrate that the professional failed to conform to the generally recognized and accepted practices in his profession, then the professional cannot be found liable as a matter of law. In setting forth such a standard, we defer to the collective wisdom of a profession, such as physicians, dentists, opthalmologists, accountants and any other profession which furnishes skilled services for compensation.

*Id.* at 435, 377 S.E.2d at 326.

In answering this court's Question II, the Supreme Court found that the collecting and processing of blood was a skilled medical service, which required that blood banks be judged by the "professional negli-

---

**3.** Notably, this Court certified several other questions to the South Carolina Supreme Court that are not relevant to the motion addressed in this Order. *See id.* at 13–16.

gence standard." Accordingly, the Supreme Court ruled that "in order to maintain her action for negligence, Doe must prove that the Red Cross failed to conform to the generally recognized and accepted practices in its profession." *Id.*

█ Plaintiffs concede that the South Carolina Supreme Court's Order in *Doe* conclusively establishes that Red Cross is entitled to summary judgment on the "negligent testing issue." The court, therefore, grants Red Cross' motion for summary judgment on this issue. The court, however, reserves ruling on the issue of whether Red Cross employees were negligent in not permanently disqualifying the donor in question based upon the health history he gave while donating blood on July 25, 1984.

IT IS THEREFORE ORDERED that Red Cross' motion for summary judgment is granted on the "negligent testing issue" and that ruling is reserved on the "donor disqualification issue."

IT IS SO ORDERED.

## APPENDIX A

### ORDER OF CERTIFICATION

TO: THE HONORABLE CHIEF JUSTICE AND JUSTICES OF THE SOUTH CAROLINA SUPREME COURT:

This court, pursuant to Supreme Court Rule 46, certifies the following facts and questions of law for consideration by the South Carolina Supreme Court. After discussing the relevant facts, this court explains briefly each of the questions presented for certification and concludes by listing those questions.

1. On the same day Jane Doe filed her suit, her husband, John Doe, instituted an action for loss of consortium, and the two suits have been consolidated. For the sake of clarity, the court herein refers only to one plaintiff—Jane Doe. Because of the highly sensitive nature of plaintiff's harm, the court respects her desire to remain anonymous.

2. As the name implies, a surrogate test is not a direct test for a condition, but rather a substitute for the real thing. It is based upon a

### Findings of Fact

In early January of 1985, plaintiff, Jane Doe,[1] entered the Lexington County Hospital in Lexington, South Carolina for spleen and gall bladder surgery. During her operation on January 9, 1985, plaintiff was transfused with a unit of blood containing the human immunodeficiency virus ("HIV"), which causes the deadly acquired immune deficiency syndrome ("AIDS"). The infected unit of blood was collected by the American Red Cross Blood Services, South Carolina Region ("Red Cross") from a volunteer donor in Columbia, South Carolina on January 4, 1985. Although plaintiff has not yet developed AIDS, she has contracted HIV, she currently suffers from AIDS-related complex (or pre-AIDS), and, according to her treating physicians and other experts, she will most probably develop AIDS, which will cause her early death.

On December 8, 1986, plaintiff instituted this negligence action against Lexington County Hospital and Red Cross in the Court of Common Pleas for Richland County, South Carolina. (Notably, negligence is the only theory of recovery on which plaintiff is proceeding). Defendants subsequently removed the case by petition filed January 9, 1987. Plaintiff has since dismissed the Lexington County Hospital and now only seeks redress from Red Cross.

It is undisputed that a direct test for AIDS was not available until May of 1985, four months after plaintiff received the transfusion in question. Plaintiff, however, contends that Red Cross was negligent in failing to employ, before January of 1985, a surrogate[2] test to identify for exclusion blood donors who were at high risk for transmitting AIDS.[3] Plaintiff focuses

correlation between the target condition, which cannot be identified directly, and another condition, which often occurs when the target is present and rarely occurs when it is not. The utility of such a test depends on the closeness of these correlations.

3. Plaintiff also contends that Red Cross was negligent in not permanently disqualifying the donor in question based upon the health history he gave while donating blood on July 25, 1984.

in particular upon the test for hepatitis B core antibody ("anti-HBc").

Plaintiff concedes that the generally recognized and accepted practice among blood banks nationwide in January of 1985 was not to use surrogate tests to screen out donors at high risk for spreading AIDS.[4] Plaintiff argues, however, that: (1) the donor whose blood contaminated Jane Doe most probably would have been screened out by anti-HBc testing; (2) anti-HBc screening was recognized as available, feasible, and effective when Red Cross, and other volunteer blood collection centers in San Francisco, implemented anti-HBc screening as a surrogate test for AIDS in the summer of 1984; and (3) anti-HBc screening was commensurate with the nationwide risk of transfusion-associated AIDS caused by the nationwide movement of blood and the nationwide incidents of AIDS.

On January 29, 1988, Red Cross moved for summary judgment. Rule 56, Fed.R. Civ.Proc. Red Cross contends that, under South Carolina law, professionals cannot be negligent when their acts or omissions are consistent with generally recognized and accepted professional practices. In other words, in professional malpractice cases, generally recognized and accepted practices are not merely evidence of the standard of care, but, instead, actually constitute the standard of care owed by the professional. Red Cross further contends that blood banking, which involves professional expertise, is subject to the standard of care applicable to professionals. Since its failure to employ anti-HBc testing nationwide by January of 1985 was fully consistent with the generally recognized and accepted practices of the blood banking industry, Red Cross contends that it is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.Proc.

Plaintiff, on the other hand, contends that South Carolina law does not absolve professionals from negligence liability simply because their acts or omissions are consistent with generally recognized and accepted practices within their profession. According to plaintiff, professionals are subject to ordinary negligence principles, under which compliance with generally recognized and accepted practices is merely evidence that a defendant acted with due care and is rarely, if ever, conclusive. *See T.J. Hooper*, 60 F.2d 737, 740 (2nd Cir. 1932); W. Prosser, *Law of Torts* § 33 (5th ed. 1984). Plaintiff argues, in the alternative, that even if South Carolina recognizes a "professional negligence standard," such a standard would not apply in a suit against a blood bank, such as the Red Cross.

Put succinctly, it is undisputed that Red Cross is entitled to summary judgment on the negligent testing issue *if:* (1) South Carolina in fact recognizes a separate standard of care for professionals (i.e., the "professional negligence standard") and (2) South Carolina would apply this "professional negligence standard" to blood banks. If, however, South Carolina does not recognize the professional negligence standard *or* if South Carolina would not apply the professional negligence standard to blood banks, Red Cross would not be entitled to summary judgment on the issue of negligent testing.

After thoroughly examining the arguments and authorities presented by counsel, after engaging in a great deal of independent research, and after holding a hearing on the matter, this court is not convinced that the South Carolina Supreme Court has had an opportunity to address squarely the two questions mentioned above. These are undisputably important questions of state law, and they are dispositive of plaintiff's charge of negligent testing. Moreover, the merits of this case command special attention because of the extent and nature of plaintiff's injury (and attendant suffering of her family) and be-

---

**4.** Red Cross's San Jose region in the San Francisco Bay area implemented the anti-HBc test in June of 1984. About the same time, one commercial plasma company also adopted it. Neither plaintiff nor Red Cross is aware of any voluntary whole blood collection facility outside of the San Francisco Bay area which conducted any surrogate tests to screen blood donors to reduce possible AIDS transmission before January of 1985.

cause of the significant role blood collectors, such as the Red Cross, play in this country's health care system. Under the circumstances, this court feels an earnest duty to these and possible future litigants not to speculate at how the South Carolina Supreme Court would resolve these important questions. The court, therefore, presents them to the Supreme Court for its consideration.

## QUESTION I:

*Does South Carolina Recognize a Separate Standard of Care for Professionals Under Which Generally Recognized and Accepted Practices in the Profession Constitute the Standard of Care Owed by a Member of that Profession?*

There are several South Carolina Supreme Court decisions whose language suggests that the standard of care in a professional malpractice case is determined by the generally recognized and accepted practices in the profession. *See Cox v. Lund,* 286 S.C. 410, 334 S.E.2d 116 (1985); *King v. Williams,* 276 S.C. 478, 279 S.E.2d 618 (1981); *Kemmerlin v. Wingate,* 274 S.C. 62, 261 S.E.2d 50 (1979); *see also Bonaparte v. Floyd,* 291 S.C. 427, 354 S.E. 2d 40 (Ct.App.1987); *Folkens v. Hunt,* 290 S.C. 194, 348 S.E.2d 839 (Ct.App.1986); *Welch v. Whitaker,* 282 S.C. 251, 317 S.E. 2d 758 (Ct.App.1984). The South Carolina Supreme Court, however, apparently has never had an opportunity to address squarely the question of whether professionals are always absolved from negligence liability where their conduct is consistent with generally recognized and accepted professional practices. Notably, courts and commentators across the country are sharply split on this question. *Compare Shelby v. St. Luke's Episcopal Hospital,* Civil Action No. H–86–3780, 1988

WL 28996 (S.D.Tex. Mar. 17, 1988) (copy attached); *McKee v. Miles Laboratories, Inc.,* 675 F.Supp. 1060 (D.Ky.1987); *Kozup v. Georgetown University,* 663 F.Supp. 1048 (D.D.C.1987); *Hines v. St. Joseph's Hospital,* 86 N.M. 763, 527 P.2d 1075, *cert. denied,* 87 N.M. 111, 529 P.2d 1232 (1974); *Hirn v. Edgewater Hospital,* 86 Ill.App.3d 939, 42 Ill.Dec. 261, 408 N.E.2d 970 (1980); Keeton, *Medical Negligence—The Standard of Care,* 10 Tex.Tech.L.Rev. 351 (1979); King, *In Search of a Standard of Care for the Medical Profession: The "Accepted Practice" Formula,* 28 Vand.L.Rev. 1213 (1975) *with McNeill v. United States,* 519 F.Supp. 283 (D.S.C.1981); *Kalsbeck v. Westview Clinic, P.A.,* 375 N.W.2d 861 (Minn.App.1985); *Brown v. Dahl,* 41 Wash. App. 565, 705 P.2d 781 (1985); *Vassos v. Roussalis,* 625 P.2d 768 (Wyo.1981); *Incollingo v. Ewing,* 444 Pa. 263, 444 Pa. 299, 282 A.2d 206 (1971); *Morgan v. Shepphard,* 188 N.E.2d 808, 816 (Ct.App.Ohio 1963); W. Prosser, *Law of Torts* § 32 (5th ed. 1984 & Supp.1988);[5] 61 Am.Jur.2d *Physicians, Surgeons, Etc.* § 115 (1972); Note, *An Evolution of Changes in the Medical Standard of Care,* 23 Va.L.Rev. 721 (1970).

## QUESTION II:

*If South Carolina Recognizes a "Professional Negligence Standard," Would it Apply to a Blood Bank such as Red Cross?*

The activities of Red Cross at issue here—the collection, processing, and testing of blood for transfusion—no doubt require the exercise of professional expertise and professional judgment.[6] Red Cross contends, therefore, that it should be subject to a professional negligence standard and cites the following authorities in support of that proposition: *Shelby v. St. Luke's Episcopal Hospital,* Civil Action No. H–86–3780

---

**5.** Prosser at least thinks that "[a]n increasing number of courts are rejecting the customary practice standard in favor of a reasonable care or reasonably prudent doctor standard." W. Prosser, *Law of Torts* § 32 (5th ed. Supp.1988) (citing *Kalsbeck v. Westview Clinic, P.A.* and *Brown v. Dahl*). According to Prosser, "proof of medical custom then becomes relevant to, but not conclusive on, the issue of due care,

consistent with the general tort law rule. *See infra* § 33." *Id.*

**6.** Because of Red Cross's concern that the South Carolina Supreme Court fully comprehend what blood banks do, this court permitted it to submit a brief memorandum on this point. That memorandum is attached as an appendix to this order.

(S.D.Tex. Mar. 17, 1988) (copy attached); *Sawyer v. Methodist Hospital,* 522 F.2d 1102 (6th Cir.1975);[7] *Hutchins v. Blood Services of Montana,* 161 Mont. 359, 506 P.2d 449, 452 (1973); *Tufaro v. Methodist Hospital, Inc.,* 368 So.2d 1219, 1221 (La.Ct. App.1979); *Hines v. St. Joseph's Hospital,* 86 N.M. 763, 527 P.2d 1075, 1078, *cert. denied,* 87 N.M. 111, 529 P.2d 1232 (1974); *Kozup v. Georgetown University,* 663 F.Supp. 1048, 1057–58 (D.D.C.1987).

Plaintiff, on the other hand, contends that the medical aspects of this case and the nonprofit character of the defendant do not change the simple fact that Red Cross collects, processes, and sells a product. Although plaintiff recognizes that South Carolina's blood shield statute, S.C.Code Ann. § 44–43–10 (Law.Co-op.1985),[8] makes blood a service for purposes of implied warranty liability, she contends that the blood shield statute in no way effects negligence theory. According to her, blood is still a product for negligence purposes. Plaintiff cites the seminal case of *Mickle v. Blackmon,* 252 S.C. 202, 166 S.E.2d 173, 185 (1969) for the proposition that the manufacturer of a product is subject to ordinary negligence principles and, accordingly, owes the product user a duty of care commensurate with the known risks of harm. *See also Orthopedic Equipment Co. v. Eutsler,* 276 F.2d 455, 462 (4th Cir.1960) (In action against manufacturer of surgical instruments for misbranding a surgical nail, the court said "[c]ustomary practice does not prescribe the duty of care.").

After reading the Supreme Court's recent decision of *Samson v. Greenville Hospital System and the Carolina–Georgia Blood Center, Inc.,* 295 S.C. 359, 368 S.E. 2d 665 (1988), this court sent counsel in this case a letter dated May 10, 1988, which discussed the propriety of certifying the foregoing questions. In that letter, the court indicated that although *Samson* did not specifically say how blood should be treated in a negligence suit, it contained language which suggested that blood would be treated as a service, instead of a product, for all purposes. In that same letter, the court also indicated its relative certainty that South Carolina recognized a professional negligence standard of care. The court then tentatively concluded that: (1) South Carolina recognizes the "professional negligence standard;" (2) South Carolina's blood shield statute made blood a service even for negligence purposes; and (3) where blood is a service, those who collect, process, and test it would be treated as engaged in a professional service and subject to the "professional negligence standard." The court then gave counsel time to respond to its tentative findings. In response to the court's invitation to comment on its May 10, 1988 letter, plaintiff's counsel submitted a persuasive argument urging the court to go forward with its earlier decision to certify the questions discussed above.

This court has truly wrestled with the propriety of certifying these questions. After further reflection, however, this court has decided that it should at least give the South Carolina Supreme Court the opportunity to address squarely these important questions of state law. Although this court is more than mindful that federal courts cannot certify *every* question of

---

**7.** In *Sawyer,* the Sixth Circuit apparently applied a professional negligence standard of care to a claim of negligent testing against the hospital defendant. Notably, however, the district court had earlier dismissed the defendant blood bank before trial on grounds of governmental immunity. *Sawyer v. Methodist Hospital of Memphis,* 383 F.Supp. 563 (W.D.Tenn.1974). Therefore, the district court and court of appeals there never had an opportunity to apply a professional negligence standard to a blood bank.

**8.** Section 44–43–10 of the South Carolina Code reads:

The implied warranties of merchantability and fitness shall not be applicable to a contract for the sale, procurement, processing, distribution or use of human tissues such as corneas, bones or organs, whole blood, plasma, blood products or blood derivatives. Such human tissues, whole blood, plasma, blood products or blood derivatives shall not be considered commodities subject to sale or barter and the transplanting, injection, transfusion or other transfer of such substances into the human body shall be considered a medical service.

S.C.Code Ann. § 44–43–10 (Law.Co-op.1985).

state law for which there is some room for doubt, the final decision to certify the foregoing questions rested upon their extreme importance and broad implications for this case and future litigation.

## QUESTION III:

*Does § 33–55–210 Violate the Equal Protection Clause of the United States or the South Carolina Constitution?*

Regardless of how the Supreme Court may rule on the foregoing questions, this court also requests the Supreme Court's guidance on at least one other matter. First, plaintiff has moved for summary judgment with regard to Red Cross's affirmative defense of charitable immunity, which is based on § 33–55–210 of the South Carolina Code.

Section 33–55–210 provides:

Any person sustaining an injury or dying by reason of the tortious act of commission or omission of an employee of a charitable organization,[9] when the employee is acting within the scope of his employment, may only recover in any action brought against the charitable organization for the actual damages he may sustain in an amount not exceeding two hundred thousand dollars. The judgment in an action under §§ 33–35–210—33–55–230 shall constitute a complete bar to any action by the claimant, by reason of the same subject matter, against the employee of the charitable organization whose act or omission gave rise to the claim. The plaintiff, when bringing an action under the provisions of §§ 33–55–210—33–55–230 shall only name as a party defendant the charitable organization for which the employee was acting and shall not name the employee individually unless the charitable organization for which the employee was acting cannot be determined at the time the action is instituted. In the event the employee is individually named under the conditions permitted above, the entity for which the employee was acting shall be substituted as the party defendant when it can be so reasonably determined.

S.C.Code Ann. § 33–55–210 (Law.Co-op. 1987). Plaintiff contends that, by limiting tort recoveries against charitable organizations to actual damages not exceeding $200,000.00, § 33–55–210 violates the equal protection clauses of the United States and South Carolina Constitutions. U.S. Const. Amend. 14; S.C. Const. Art. I, § 3.

In the landmark case of *Fitzer v. Greater Greenville, South Carolina Young Men's Christian Association*, 277 S.C. 1, 282 S.E.2d 230 (1981), the South Carolina Supreme Court abolished the common law doctrine of charitable immunity. Five years later in *Hasell v. Medical Society of South Carolina*, 288 S.C. 318, 342 S.E.2d 594 (1986), the court held that *Fitzer* had by clear implication overruled § 44–7–50, a charitable immunity statute predating the *Fitzer* decision. The court in *Hasell*, however, declined to comment on the constitutionality of § 33–55–210, enacted over two years after *Fitzer*, because the issue was not properly before it.

The plaintiff here has challenged the validity of § 33–55–210 on equal protection grounds. Upon her motion, this court requests that the South Carolina Supreme Court determine the constitutionality of that code section in light of the Fourteenth Amendment to the United States Constitution and Article I, § 3 of the South Carolina Constitution.

## QUESTION IV:

*If § 33–55–210 is Constitutional in its Entirety or in Relevant Part, How is the Employee of a Charitable Organization "Adjudged" to have Acted Recklessly, Wantonly, or Grossly Negligent as that Term is Used in § 33–55–220?*

Plaintiff has moved this court to add as defendants several Red Cross nurses. She contends they were reckless, wanton, and grossly negligent in failing to disqualify permanently the infected donor in question based upon a health history he gave on

---

**9.** Red Cross is undisputably a "charitable organization" as that term is defined at South Carolina Code Ann. § 33–55–200 (Law.Co-op.1987).

July 25, 1984—around five months before plaintiff was transfused with HIV infected blood. Section 33–55–210 provides that in a suit against the charitable organization, the employees of the organization shall not be named individually unless the identity of the employer organization cannot be determined at the time of the suit. S.C.Code Ann. § 33–55–210 (Law.Co-op.1987). That section also requires that the organization be substituted as the party defendant when its identity is determined. *Id.* Section 33–55–220, however, provides: "that the bar to any action against the employee, provided herein, shall not apply where the employee is *adjudged* to have acted recklessly, wantonly, or grossly negligent." S.C.Code Ann. § 33–55–220 (Law.Co-op.1987) (emphasis added). The question left unanswered by the Code and by South Carolina case law is: How may an employee be "adjudged" reckless, wanton, or grossly negligent *unless* he is made a party to a lawsuit—which § 33–55–210 specifically prohibits where the identity of the organization is known? This court recognizes, of course, that this question need be reached only if the Supreme Court upholds the constitutionality of § 33–55–210 in its entirety or in relevant part.

### Summary of Questions Presented for Certification

I. Does South Carolina recognize a separate standard of care for professionals under which generally recognized and accepted practices in the profession constitute the standard of care owed by a member of that profession?

II. If South Carolina recognizes a "professional negligence standard," would it apply to blood banks such as the Red Cross?

III. Does § 33–55–210 violate the equal protection clause of the United States or the South Carolina Constitution?

IV. If § 33–55–210 is constitutional in its entirety or in relevant part, how is the employee of a charitable organization "adjudged" to have acted recklessly, wantonly, or grossly negligent as that term is used in § 33–55–220?

Columbia, South Carolina

June 14, 1988

APPENDIX TO ORDER OF CERTIFICATION

## PROPOSED FACTS CONCERNING BLOOD BANKS

### FACTS

The American Red Cross collects approximately half of the nation's volunteer human blood for transfusion. The remainder is collected by hospitals (about 25%) and independent community blood centers. Approximately 3.5 million people are transfused each year with this blood, usually in the form of components such as packed red blood cells, plasma or platelets. Blood, a living human tissue, is both a biologic and a drug. It therefore cannot be administered without physician's prescription. Public Health Service Act, 42 U.S.C. § 262; Federal Food, Drug & Cosmetic Act, 21 U.S.C. § 353; 21 C.F.R. § 606.121(c)(8)(i) (1987).

In January 1985, plaintiff Jane Doe had her spleen and gall bladder removed at Lexington County Hospital. In the course of her treatment she had to be transfused with many units of blood components. One unit apparently contained HIV, the human immunodeficiency virus, the etiologic agent presumed to cause AIDS. No screening test for detecting possible carriers of HIV was licensed for use until March 1985. That test detects antibodies to HIV and cannot detect individuals who have not been infected long enough to develop sufficient levels of antibodies. To date, no test for HIV itself has been licensed for donor screening.

Substantial health risks have always been associated with transfusion therapy and the Red Cross and other blood collectors attempt to exclude donor blood thought to be at significant risk for transmitting infectious diseases by: (1) health history questionnaires; (2) limited physical examinations; and (3) serologic tests on the blood itself. These screening and testing measures are codified in federal regulations and privately promulgated standards. Such standards have evolved since World War II, when blood collection first began in earnest in the United States. Blood service programs, whether in hospitals or volunteer blood collecting centers like the Red Cross, are dependent upon judgments by

doctors and other professionals in both developing and implementing donor screening and testing standards.

Within the Red Cross, the Blood Services Program operates under license of the United States Food & Drug Administration. The responsible head under that license during most of the time relevant to this proceeding has been S. Gerald Sandler, M.D. He is board certified in internal medicine by the American Board of Internal Medicine and in blood banking by the American College of Pathology. Sandler Dep. Tr. at 38. Dr. Sandler's predecessor and supervisor for blood services is Alfred Katz, M.D., who is board certified in pathology with subspecialties in blood banking, anatomical and clinical pathology and hematology. Katz Dep. Tr. at 22. The Red Cross's blood services program operates in various "regions" throughout the country, including the defendant South Carolina Blood Services Region. The Medical Director of the South Carolina Region, Dr. Todd Kolb, is board certified in pathology with a subspeciality in blood banking. Kolb Dep. Tr. at 5.